Seabrook and Murray Huberfeld. I'm Richard Levitt. I represent Norman Seabrook on appeal from his conviction for honest services fraud in his 58-month sentence. He's presently at liberty pending this appeal. We've raised two issues on appeal. I will concentrate on the first issue, but, of course, I'm happy to address the second one as well. Whether or not the district court erred when it permitted the government to introduce evidence that Mr. Seabrook's union lost $19 million of its $20 million investment in Platinum Partners' hedge fund some two and a half years after Mr. Seabrook recommended those investments and, indeed, some six months after Mr. Seabrook was arrested in this case. The government has posited three rationales for admitting the lost evidence. The first rationale was that the lost evidence was relevant to whether or not it was reasonably foreseeable that the scheme could, quote, "'cause some non-de minimis economic or pecuniary harm to the victim.'" Of course, to be relevant, evidence has to tend to prove or disprove a matter that's in dispute. If we put aside the fact that the reasonable foreseeability that a hedge fund could lose money is not seriously in doubt, there's no question that reasonable foreseeability has to be determined based upon the events occurring on day one, when reasonable foreseeability supposedly occurs. For example, if I bought a car and the question was whether or not it was reasonably foreseeable that the battery might break at some time in the future, it certainly would be relevant if I had been handed a manual at the time I purchased the car that warned me that the battery might fail in the future. It would not be relevant, however, unless we live in some kind of a time warp that two years down the road, two and a half years down the road, the battery, in fact, failed, because that would say absolutely. But would it be relevant if you drove off the lot and the battery failed immediately? Like, would that not at least be relevant to the idea that it was foreseeable that something was going on with the battery? It wouldn't be relevant if the battery failed two seconds after he drove off the lot, because what's relevant is you have a case and the whole issue is whether it was foreseeable that the battery was going to be defective, and two seconds after he drives off the lot, the battery fails. The jury does not get to know that. No one should know that. It's not at all probative of whether there was a problem with the battery. Well, the question is whether or not, in this case, the question is whether or not it was reasonably foreseeable to my client, to Mr. Seabrook, and to the union. And the only thing that they knew, or should have known, was whether or not it was reasonably foreseeable at the time they made the investments, that the investment might fail. However, even as to reasonable foreseeability, one is the subjective part about is it foreseeable to that person, but if it's just never going to happen, then it wouldn't be reasonably foreseeable. Well, of course, we don't know if something will never happen, because it could happen at any time in the future. Well, but just because it's a long shot, it wouldn't be reasonably foreseeable even if the defendant was subjectively aware of a 0.0001 percent chance of failure, right? There has to be some actual serious chance for something to be reasonably foreseeable. It has to be reasonable for a person to believe that it was foreseeable. It's certainly reasonable for a person to believe it's foreseeable if they're told it's foreseeable. And, in fact, what happened in this case, Your Honor, was that the government was permitted to introduce very potent evidence that, in fact, it was reasonably foreseeable. They were permitted to learn, for example, that the prospectus from Platinum Partners explicitly said, don't invest in this hedge fund unless you are prepared to lose your entire investment. But this was conceded. Mr. Seabrook acknowledged that it was reasonably foreseeable, and that was taken out of the case. It was never in doubt. It was never questioned. I didn't say it was never in doubt. It was never questioned. It was never questioned. It was never questioned at all. It was essentially conceded, so the government couldn't put in any evidence about how big the risks were? No. The reason that they were permitted to put in the evidence of reasonable foreseeability was because it permitted the government to argue that Mr. Seabrook put his own interests above the interests of others. But, yes, he personally foresaw it as a possibility. Sure. But doesn't it also matter how significant the risk was? First, I don't think that it does. The only issue under Rubicki is whether or not it should be considered reasonably foreseeable. That's the issue. But isn't reasonable foreseeability about whether it's a serious risk? It's a serious risk if the prospectus tells you it's a serious risk. It's a serious risk if your own attorney tells you it's a serious risk. It's not a serious risk at the time of the investment. If two and a half years down the road, six months after Mr. Seabrook is arrested, that, in fact, the hedge fund goes bust, for whatever reason it went bust. In any event, to the extent that it had the slightest relevance at all, and I don't think it had any relevance, to the extent it had the slightest relevance at all, clearly, the government was more than satisfied, whatever rights it had, by introducing the evidence of the prospectus that warned in no uncertain terms, and as everybody knew, that a hedge fund could go bust. There's no issue about whether or not somebody can lose money in a hedge fund. It's not the issue. Kennedy, what about testimony that, for example, Mr. Euperfeld was told and knew that it was a fact that this hedge fund at this time was hemorrhaging money and needed to get these investments? Now, Mr. Seabrook didn't know that, right? He didn't he didn't he was not privy to that information. That's correct. Is that, therefore, irrelevant to assessing whether this was a reasonably foreseeable risky investment? I believe that it was relevant to the case, but not relevant to the reasonable foreseeability issue. And certainly why is it reasonable, why is it relevant at all to the case once Mr. Euperfeld is not on trial with the case? Because I believe, why is it relevant to the case at all? Because it explains why the investment was offered to Mr. Seabrook in the first place, and it helps explain what Mr. Rettnis's motives were or allegedly were in presenting this deal to Mr. Seabrook. So it was relevant for certain purposes, although one could argue about that, but I don't think that it was relevant to the issue of reasonable foreseeability, which is really something that has to be determined. So the fact that there was a significant, objectively, a significant risk of the fund going bankrupt at the time is relevant, but it is not relevant to that question, that it actually did go bankrupt not that long after this investment is made. Well, it actually was quite a bit, it was two and a half years after the investment and six months after Mr. Seabrook was arrested in this case. It doesn't sound that far, considering that no one took the money out before then or was able to take the money out. Well, actually, a million dollars was in fact taken out, but only a million dollars. Five percent, yes. Well, did you say something about the harm? So you just said that there was all this evidence about everyone was aware that there was a risk that it could go bust. So how does introducing evidence that it, in fact, did go bust at a later date harm your clients? Well, that's a good question, and it's very easily answered in several different ways. One way was that we know that at the first trial, when this evidence was not admitted, the jury was hung, and it wasn't hung just by one juror. It was hung by several jurors. And the only difference between the first trial and the second trial, the only meaningful difference, was the lost evidence. Also, we know, when we look at the way in which this evidence was used, it was used in precisely the way the government promised it would not use the evidence. So in other words, the government, in order to convince Judge Hellerstein to permit it to use the evidence, said very clearly that we understand, we understand it would be wrong for us, and they cited a case, it would be wrong for us to offer to argue how this loss impacted the lives of the so-called victims, and we're not going to do it. And they pledged not to do it. And yet, when, in fact, this case was argued to the jury, it did exactly the opposite. It did exactly the opposite. Union member dues and retirement money owed to hardworking men and women of COBA lost. $19 million of union member dues and retirement funds lost in bankruptcy, but Norman Seabrook, $60,000 richer. I doubt very seriously if we're going to recover any of the $19 million. So not only did they think it was lost, but then there was testimony that we wrote it off. Then on closing argument, and the government in its brief denies having said this, but in closing argument, what the government argued was $19 million gone, retirement money gone, that's what this case is about. That's why we're here. That's why we're here. Then the government argued money that was supposed to help ease the paths of people who have a dangerous job, an important job into retirement, good men and women who deserved representation, who deserved better than somebody who would betray them. The government made precisely the arguments that it acknowledged it was not permitted to make and which it acknowledged would be reversible error. And yet it made those arguments anyway. The government also alleged that this evidence was relevant to show Mr. Seabrook's intent to cause a pecuniary loss to the union. That was precisely the opposite of what the government's theory of the case was. The government's theory of the case was that Mr. Seabrook was offered 10 percent of the profits that Platinum Partners would make of a successful investment if the union made money. So now the government is arguing it was relevant to his intent to cause harm to the union when, in fact, the only way Mr. Seabrook, under their theory of the case, would have made money would be if the union made money and if the hedge fund made money. There is not a theory that the government has posited of relevance that holds weight here. And certainly the way the government exploited this evidence was precisely the way they promised not to, precisely the way they agreed would be reversible error, and they did it anyway. And they did it, most respectfully we suggest, because they thought they would get away with it, because they knew they needed it, because they knew that when they didn't have it at the first trial, they didn't win the first trial.  So not only the government. Sotomayor. I said thank you. Your time has expired. Yes, Your Honor. Thank you. Thank you, Your Honors. Kannon Shanmugam of Paul Weiss for the other appellant, Murray Huberfeld. May it please the Court, Mr. Huberfeld's appeal presents distinct issues for Mr. Seabrook's. Mr. Huberfeld pleaded guilty only to one count of conspiracy to commit wire fraud. Yet the district court used not the guideline for fraud, but the guideline for commercial bribery, which more than tripled the applicable guidelines range. Now, the government confesses error here. It concedes that the district court erred in using the bribery guideline, but remarkably, it contends that the massive resulting error here was harmless, simply because the court stated in passing that it would have imposed the same sentence regardless. A district court can. Passing, really, right? I mean, the judge says, whether I go this way or I go that way, this is where I come out. And he says that after a very long period of time addressing what the judge thought was what was most serious about the case. True. But Judge Lynch, the judge said that after. True or not? The judge said that at the culmination of sentencing. I'll give you that. He said it once, but he said that after repeatedly recognizing the anchoring effect of the guidelines. It's true that he, that's true. Yes. He actually did. It's one of the rare cases, I think, where a judge specifically acknowledges anchoring, though that was about the 50 something month that he got to by one or another calculation. Yes. But the judge, I think, did recognize that. What I'm asking you, what I'm asking you about is, didn't the judge say all through his sentencing that what disturbs him about this case is that this was an effort to corrupt a union official, to blind him to the risks by putting money in his pocket? He said that's what made this a pungent case. That is, that is certainly correct. We certainly don't dispute the proposition that the judge effectively sentenced Mr. Huberfeld for bribery. He said at page 150, bribery is a serious offense. You're not, excuse me, you're not suggesting, or at least I don't read your brief as suggesting, maybe I misread it, that it was improper for the judge to consider that factual context as part of relevant conduct. You're making, I thought, the more technical argument that this doesn't factor into the guidelines the way the judge thought it did. Well, we do have our substantive reasonableness argument, but let's bracket that for the minute, Judge Lynch. On the issue of procedural reasonableness, I think our submission is a modest one. It is that when you read Judge Hellerstein's comments in context, this is not a case in which it is clear that Judge Hellerstein would have imposed the same sentence if the conceded guidelines error is taken away. And that is because the judge not only kept coming back to the guidelines as the anchor, but also sentenced Mr. Huberfeld at the bottom of what he thought was the applicable guidelines range. Now, of course, we think that even under the commercial bribery guideline, the judge miscalculated the relevant sentence. And given the judge's sentencing at the bottom of the guidelines range, I think that that has to lead to vocateur. But this court has never, I would respectfully submit, applied harmless error to an error of this magnitude simply because a judge said that he or she would have imposed the same sentence regardless of the guidelines. You think he would apply the same sentence because that's why you want it taken away from him on remand? Well, we do have our argument on substantive reasonableness, Judge Lynch, which is, of course, the argument that a judge cannot sentence someone for another offense. A judge can, as a matter of substantive reasonableness, take that other offense into account. But what is clear from this transcript, I would respectfully submit, is that the judge did more than that. He sentenced Mr. Huberfeld for bribery. And if you take a look at the statement of reasons which the government has given, Mr. Ollerstein thought that the applicable guideline was the bribery guideline and was not departing from the applicable guidelines range. Now, on remand. Let's assume for the minute that he was taking into account bribery and it's part of an overall uncharged conduct and that's permissible. What do we do if we're in that context with the error that he did, he made in calculating the bribery guideline? So you say that it should have been 24 to 30 and he calculated 30 to 37 and he gave a sentence of 30 months. It's within both ranges. So how do we say that it's clear that it was a, why is that a reversal? Especially since it's always instructive anyway, right? Because the true guideline is the six to 12 months. Well, Judge Menasche, I think our submission here is that this court should vacate and remand, leaving aside for the moment the question of reassignment, so that Judge Ollerstein or another judge can determine whether an upward departure from the correct range is warranted. And, of course, this Court has made clear that where you have a departure of substantial magnitude, a correspondingly more compelling justification is required. And there is the procedural but quite important requirement that the judge – Robertson, if I took Judge Ollerstein at his word that he said, even if I were going to the six to 12 guideline range, I would still vary upward to 30 months, what can you point me to that would give me confidence that, oh, if he had properly calculated the bribery guideline, which you say is the incorrect guideline to begin with, he would have varied up to 24 months instead? Well, I think we simply – At the very least, it would require more explanation. Well, I think that's right, which is to say we don't know. And that's exactly why we think respectfully that vacatur and a remand would be required, because we have no idea what Judge Ollerstein would have done in that counterfactual world where he thought that 24 months was the appropriate guideline's minimum. Now, again, the government concedes that six to 12 months is the appropriate range. And so we would submit that this Court should simply vacate and remand with instructions, of course, that that is the appropriate range for the judge to determine whether an upward departure of this magnitude – and obviously, this would be a quite significant upward departure – is warranted here. And I think that this Court's cases support the proposition first that a judge can't – It's not the upward departure, right? He thinks it's part of this overall conduct that is corrupting the union process and so on. Like, that is an explanation for upward departure. I'm asking, given the fact that he's doing an upward departure, why would it make a difference if the guideline he was calculating just as an instructive matter was calculated differently? Sure. Well, I'd like to address that. And then I do want to spend at least a couple minutes with the Court's lead on the issue of restitution, which is also obviously quite important here. I think that what the judge would have to do under those circumstances is, again, start with the appropriate range, engage in an analysis of the 3553A factors. I think one thing that is disturbing here, as we point out in our discussion of substantive reasonableness, is that the judge really didn't permit Mr. Huberfeld to present evidence on the critical issue of foreseeability, which was the basis for his determination that a sentence taking into account bribery was warranted. Mr. Huberfeld asked for a hearing on that. That was rejected. And the government here, ironically, is relying on the evidence that was presented in Mr. Seabrook's trial, a trial to which he was not a party. So all of these things — But there's also a trial to which Mr. Huberfeld was a party, right? Yes, where the jury hung. That record was there also. And again — Whether the jury hung or not, the judge was — you're saying the judge couldn't take account of that evidence because the jury hung? No, I'm not — So the judge could take account of the evidence in the trial that Mr. Huberfeld had every opportunity to contest the evidence. Yes, but here, it's not entirely clear, frankly, what the judge was relying on as the source of the evidence. But we're not making the broader argument here that the judge can't take into account other evidence, statements in the PSR and the like. We're making simply — And you're not taking issue with the fact that if a person commits one crime as part of a scheme to commit a bigger crime and only pleads guilty to the smaller crime, that if the larger scheme is proven to the satisfaction of the court by a preponderance of the evidence, the judge is entitled to take that larger motive for the crime into account. Leaving aside our arguments on restitution, Judge Landau — Restitution's a different issue. Yes. For the purpose of imposing a jail sentence that is within the maximum sentence for — allowable for the crime of conviction, the judge is entitled to consider, for example, if someone's charged with stealing a firearm, that there's ample proof that why he wanted the firearm was to assassinate the president. Judge Lynch, we are not making that argument, nor are we making an evidentiary argument here. We are simply making on substantive reasonableness, leaving aside the confession of error on procedural reasonableness. We are simply making the argument that what a judge can't do is sentence somebody for another offense, as opposed to merely taking that offense into account. And I would respectfully submit — And let's take — let's take one further issue. Assuming that the judge can take the larger scheme into account, is it not appropriate for a judge — this may not be what the judge did here, but would it not be appropriate for a judge to reference another guideline as a way of saying — a check on his own instincts, as it were? I think this guy was trying to assassinate the president when he stole this gun. What's that worth? I think that's like life imprisonment. But if it turned out that the guidelines had something lower, wouldn't that be something that the judge ought to be looking to, which is, I ought to know what's the recommended punishment for that kind of thing? Judge Lynch, looking to it, yes, but actually using it, no. Actually using it, no. Both as a matter of procedural and substantive reasonableness, I would respectfully submit. And particularly given the judge's findings about Mr. Huberfeld's character and conduct, I think that a sentence respectively for — Yeah, another judge might look at that character in a different light. Perhaps the character of this defendant involves a prior fraud — criminal fraud conviction and several settlements for fraud — fraudulent-type conduct with the SEC, which doesn't sound like the kind of character of the most noble person I ever had to sentence. Well, but Judge Hellerstein even recognizes — even recognizing that, did reach that conclusion. Of course, another judge, if the case is reassigned, would be free to make a different determination. But I think that in this case, when you have that abundant evidence of good character, what a judge can't do is, again, effectively sentence for another offense as a matter of substantive reasonableness. Finally, can I ask you another question about what we should do and must do and must not do in this case? If we conclude that there was indeed a procedural error with respect to the guideline calculation, is it your position that we should somehow go on and consider substantive reasonableness anyway? Or should we just send it back to the district court to correct those errors? And then maybe we never have to reach substantive reasonableness because maybe the sentence that ultimately results is one that you don't need to appeal on that ground. I think, Judge Lynch, this Court has recognized that it can reach substantive reasonableness even after a determination of procedural unreasonableness. And I would respectfully submit that, given the many irregularities in the sentencing proceeding in this case, if this Court were not to reassign, we would respectfully submit that the Court provide guidance to the district court on remand by engaging in a substantive reasonableness analysis. Now, I do want to say just a word about restitution because I do think that restitution is very important to our client and presents a very substantial issue here. Ultimately, our submission is that the district court's sua sponte decision to award $19 million in restitution after Mr. Huberfeld had already made a voluntary payment of $7 million was improper. And that is for the simple reason that, as the Supreme Court held in Huey and as this Court recognized in Local 46 and has recognized in subsequent cases, the restitution analysis turns on losses caused by the offense of conviction. And here the offense of conviction is the narrower conspiracy to commit wire fraud and not the broader conspiracy to engage in bribery. And here the government makes no argument that the wire fraud scheme somehow caused the losses by the union. And this Court, in all of the cases on which we rely and on which the government has relied, has made clear that only losses that are part of the scheme of conviction are available under the MVRA. And so we would respectfully submit that the district court's sua sponte decision here was erroneous as a matter of law and that the restitution award, like the sentence, should therefore be vacated. Although when he calculated the restitution, he used this $400,000 amount, which was the alleged fee that would have been gained through this without any other explanation, which I found sort of confounding. That was, I think, one of the irregularities with regard to the substantive sentencing because Judge Puhler, that $400,000 figure was what was used to determine the benefit under the now conceitedly inapplicable bribery guideline. I would respectfully submit that it's totally unclear where that figure came from. It seems as if the judge was perhaps relying on evidence from the Seabrook trial or his own intuitions about how much platinum would have benefited from an investment of that variety. But again, the judge's application of the commercial bribery guideline here was idiosyncratic, to put it mildly. And of course, everybody agrees that that guideline is inapplicable. And so again, I think that Another funky aspect of the $19 million restitution award, isn't there, that the $7 million that was somewhat solicited by the judge in advance, sui sponte, maybe it'll help you on sentencing if you make voluntary restitution, and then the guy makes some voluntary restitution and it's sufficient at least that the union withdraws any claim for restitution, and then he gets socked with the $19 million restitution anyway? Well, I would respectfully submit, Judge Lynch, and I want to be very respectful to the district judge who has served with such distinction for many years, but I think that that is the perhaps most significant irregularity with this case. The judge did effectively solicit the voluntary payment in his order, posing supplemental questions to the parties. And then when Mr. Huberfeld made such a voluntary payment to the union and the union withdrew its restitution request, the judge nevertheless imposed the $19 million restitution award without taking into account the $7 million, and further, and perhaps the greatest irony, said at page 151 of the joint appendix, it is not appropriate that wealth can buy lenity. Our submission on the restitution award as a matter of law is simply that the loss here was conceitedly not part of the scheme of conviction, and I think if you take a look at this Court's recent decision in Calderon and even the government's supplemental submission in response to Calderon, the government really doesn't make the argument that the loss was caused by the more narrow scheme of conviction. But I do think that as this Court is making a determination about whether to reassign, realizing that that is something that this Court does not do lightly, that it can take into account that irregularity in how the restitution award came into being in making the determination about whether reassignment is advisable to preserve the appearance of justice. Thank you, counsel. We'll hear from the government. Good morning, and may it please the Court. My name is Martin Bell. I was the lead attorney at the trial that resulted in Mr. Seabrook's conviction, and I also represented the government at Mr. Huberfeld's sentencing proceedings and, of course, here on appeal. Mr. Seabrook and Ms. Do you represent them at the first trial? Yes, Your Honor. I was present at both trials. Your Honor, or Your Honors, it may make sense for me to begin with Mr. Seabrook and then move on to Mr. Huberfeld unless there's a preference otherwise. No preference. Go on. Thank you, Judge Pooler. With respect to Mr. Seabrook, when Mr. Seabrook went to trial for essentially betraying his union's membership by subjecting their funds to a massive and unpalatable risk so that he could profit personally, the fact that the risk turned out to be massive and unpalatable came into evidence. That itself is not uncommon or terribly extraordinary. Indeed, in garden variety fraud trials, the fact of the loss winds up coming in fairly often. The court is not required to essentially freeze the bullet in midair. And in many such trials, the loss comes in without having the specific relevance that it does here to things that the government actually has to prove and to issues on which Mr. Seabrook actually joined issue at both the first and the second trial. That being materiality, which we've sort of conflated here with the reasonable foreseeability issue, and with respect to intent. Materiality, needless to say, is an element. And insofar as this Court's precedent in rebicki actually establishes that you can, to some degree, demonstrate the objective, as Your Honor pointed out before Judge Lynch, reasonable foreseeability and thus materiality of the risk, and risk is a key notion here, Your Honors, that Mr. Seabrook was subjecting his union to, then the loss is admissible for that reason. But that is particularly the case here, because at the first trial, and again at the second trial, Mr. Seabrook's very able trial counsel specifically put at issue not only the question of whether Mr. Seabrook understood this to be a quote-unquote good deal or bad deal, but in fact whether it was, in fact, a good deal or a bad deal. To the extent that we talk about a 403 analysis, or to the extent that we talk about sort of at the opening of things, whether this was relevant or probative at all, it's certainly, I would maintain that it is objectively, but it certainly is up against that backdrop of Seabrook's protestations that it was not, that the deal was good, and that the risk itself didn't really matter. And so with respect to materiality, I would submit that the case law is relatively clear that if only for that reason, the quote-unquote time warp that Mr. Levitt refers to actually does exist, insofar as the results can, in fact, shed some light on materiality. The same, I would submit, is true with respect to intent. We are talking about a scheme-based offense here, and we cite to law that makes it pretty clear that in order to — that the loss or the result or the consequences of the dishonesty can shine a light as to the intent. And the intent here — Breyer, how can that be in this case? I mean, his intent, blinded by the bribe, I suppose, was that everybody would make out, right? I mean, that's not good enough to mean he's not guilty, but that is — but the — he wasn't intending that the investment would be lost, if only because if that happened, it makes it all the more likely that he's going to be caught and prosecuted. And to be clear, and to Mr. Levitt's point to that end, I'm not suggesting that it was Mr. Seabrook's hope that the whole thing would tank. But we — what he did intend to do as part of perpetrating this act is to subject the union to a risk that otherwise would not be palatable to them. And the question that we then have to ask ourselves, Judge, I respectfully submit, is how do we actually express that risk the way that we ordinarily would express just loss — just loss? The point here is that the loss is representative of the risk that Mr. Seabrook intended to subject his union to in order to personally profit. Risk is a matter of — is a matter of probability or a matter of chance. It's not the easiest thing to express in the way that sheer loss is, but a reasonable way to represent that that risk actually was an unpalatable risk is what happened. And that's consistent with this Court's precedence. And so I would respectfully submit that for both of those reasons, there was a substantial probative value here, both in a vacuum and against the context of what it was that Seabrook's, again, very able counsel took great pains to establish in both trials with respect to this not only not being a material determination, but the deal objectively being good. That was something that we, I think, had every right to push back against in reasonable fashion and ultimately did. That's the whole reason for seeking to put in the loss. And frankly, the vigor with which Mr. Seabrook's trial counsel pushed back at those notions in the first — in the first trial is part of why we saw fit to attempt to introduce this in the second trial, because issue had, in fact, been joined. Mr. Levitt speaks to the — Roberts. Can we move on to the Huberfeld Guideline? Sure. If there's nothing else on Seabrook, I'm happy to get to Mr. — I did want to refer to the government's summation. You did say — I assume it was you, if you were the lead counsel, doing the main summation? It was, Your Honor. You say, ladies and gentlemen, it's easy to think about this case and be fixated on the loss. $19 million of retirement money, money that was supposed to help ease the paths of people who have a dangerous job, an important job, into retirement, right? Isn't that — you know, you say in your brief, well, I was telling them not to look at the elephant in the room. But, of course, the best way to have them not look at the elephant, if you think they shouldn't look at it, is you brought the elephant into the room, and you didn't have to. You bring the elephant into the room, and you're really saying, you know, pay no attention to this elephant. I recognize it's a really big elephant, and it's right there in front of you. It's going to be hard to look past it and look around it and see anything else in the case, because that elephant is, wow, you know, it's going to cause the loss to all these people. But don't think about that. Now that you've spelled out what the consequences have been, don't think about that. Is that cricket as it were? I would raise two reasons, Your Honor, why we didn't play those specific elephant games. The first of these reasons is what I followed that statement up with is a very careful notation that Mr. Seabrook's crime was essentially committed before the loss actually took place, before the catastrophic events at Platinum, and that the jury should keep that in mind. But I also followed. It is a legitimate argument, I guess you'd also say, that Mr. Seabrook did betray the union by subjecting them to that risk. He did play games with their retirement money. And I suppose all that stuff about the people with the dangerous job and the important job would be relevant even if the $19 million hadn't come into it. And it would be relevant in part because part of what we have to establish, part of what we have to prove, and perhaps more importantly, part of what the record at that point supported was that there was indeed a fiduciary duty that Mr. Seabrook violated. In the absence of that, you don't have private honest services fraud. And so I think that referring to that on that basis was above board. The other thing that I would note is that both in the first trial and in the second trial, Seabrook's counsel also elicited a lot of relevant information to that particular sentence with respect to the fact that these folks had dangerous jobs and depended on Norman Seabrook when he spent a substantial amount of cross-examination with our first witness, the successor to Mr. Seabrook, demonstrating that Mr. Seabrook had done a bang-up job leading the union. And so for that reason, even further, those things were above board items to evoke as part of that closing. And, in fact, I mean, I very consciously made that turn of phrase so as to both put this in perspective and to link it to materiality, although that was more the one other mention that took place. Anyway, I know we want to get back to Mr. Huberfeld, and I'm happy to begin with the next two minutes to do that. Thank you. I appreciate that very much, Your Honor. So with respect to the guidelines, we concede error. The question is, I think, whether the claim that Mr. Huberfeld's counsel makes is true, that we are solely using Mr. — solely using Judge Hellerstein's declaration at the end of the sentencing proceeding, that he would have come out to the same result in a pure 3553 world. And what I would respectfully submit, and this would continue on a point that Judge Lynch raised earlier, is that there are other data points that we have in the constellation of potential data points to reach the conclusion that Mr. — that Judge Hellerstein would have, in fact, gotten there anyway, and that that wasn't just some sort of talismanic phrase tossed out to sort of inoculate him against review. The first thing Judge Lynch already noted, which is the lengthy colloquy, this was a four — it wasn't a four-hour sentencing, but it was at least a couple of hours where Judge Hellerstein expressed substantial concern about the source of the pungency, as you noted earlier, the fact that this was a crime that was in the service of yet another greater offense. Okay. So I'm worried about the greater offense and all of this other conduct. He's using the bribery guideline as a guide to how he might vary from the other guideline, in your view. But then what about the issue about the calculation of the bribery guideline? So he gave Mr. Huberfeld a sentence of 30 months, which is the lower end of the bribery calculation, but as the other side has pointed out and seems to be correct, he calculated that wrong. It should have been 24 to 30 months. Do you disagree with that? I don't disagree with that. I — we do acknowledge, I think, in our briefs that that, too, would — that, too, would have constituted error if that were the basis upon which Judge Hellerstein had actually sentenced him. Of course, he did not. But I also don't think that that's a controlling consideration in light of the other considerations that were utilized here. And I want to point to just two of them that haven't — If he calculated the guideline under which Huberfeld was actually sentenced, we would reverse, right? But because he's calculating this guideline that's just kind of instructive for how he varies from the initial guideline, it's fine. Is that your view? I — in light of the full context, I think the answer is actually yes. One, because the material difference between what the guideline that Judge Hellerstein did not use would have been significant but not necessarily — would have been something but not necessarily significant in light of the full array of other factors. Here, let me get to those other factors, if I may, Judge Menachie, and that may help fill out the point. A couple of days before this sentence, Judge Hellerstein had sentenced Mr. Seabrook to 58 months incarceration for his role in the fraud. Fifty-eight months gets you about roughly twice what it was that Mr. Huberfeld wound up getting for his involvement in, as convicted, the crime that enabled the crime. There was also a 24-month recommendation from probation that was part of the PSR that I think has gone forgotten here. All of these are data points that I think could help further triangulate the fact that something within the range of 30 months was reasonable and had an anchorage in the total mix of factors that courts can and do consider. However, he was going to go to the lowest number in the range? In the theoretical range? Anchored by the correct range of the sentence. This is six times higher than the lowest range on the original, on the sentence based on the lower amount. Six times higher without, as counsel explained, any kind of an explanation. I do think, Judge, that it may not surprise you to learn that I like to think of it a bit more as two years higher rather than five times higher. But in any event, I think that, but I do think, and I suppose this moves us into substantive land here. Part of, I do think that it's within reason to. Higher than what? Sorry, I missed. I think, I believe that the operative comparison here is that. Six months versus 30 months. That means six months being the top of the agreed upon guideline range versus the lowest of the range. Right. And what I'm suggesting there is that there is a meaningful distinction that could easily account for two years' time between a $60,000 fraud of a hedge fund in a vacuum versus a $60,000 fraud that served as a contingent component in one of the more infamous and brazen bribery schemes in the modern history of the Southern District, in one that ultimately set into motion a chain of events that led to a tragic event for countless correction officers. Counsel, we might not disagree with you, but we like sentences where every step is fully explained. And you cannot tell us that this sentence has those earmarks of full explanation. I think that, Your Honor, the very best that I can do is note, as Judge Lynch did earlier, the full record of concern which articulates, not in the most succinct sort of way, in a sort of according to Hoyle's statement of reasons sort of way, why this particular twist on a $60,000 fraud was so troubling. And I can understand, candidly, Your Honor, I think that this is the strongest point in Mr. Huberfeld's favor. It's inherently troubling when you start out sort of off the guidelines to begin with. But I do believe that the sum total of what Mr. — of what Judge Hallerstein said with respect to the characteristics of this offense, the context in which this offense took place, does actually support the ultimate result. I'm probably with you on substantive reasonableness of the sentence here, but it seems to me you've got a hard row to hoe to say we have to think that this is exactly the sentence that the judge would have come out with even if, for example, he realized that the bottom of the commercial bribery guideline that he paid a lot of attention to was actually 24 months, which just happened to be exactly the sentence that the Probation Department recommended in this situation. It seems to me it's a pretty reasonable possibility that if this went back and there was a recalculation, even that factor alone could make a difference. I'm not sure that, you know, where a judge is clearly saying I put a lot of weight on this commercial bribery sentence. I thought, well, that's a reasonable thing for him to do as a cross-check on what's reasonable in this circumstance. He got that wrong. Not that he did it wrong, but he got it wrong, even getting it right, assumes that this $400,000 number comes out of somewhere other than the judge's own personal recollection of how hedge funds typically charge. It's very hard for me to see that there's not a problem here. The one arrow remaining in my quiver, Judge, that I would add to the sum total of what happened here was not the naked application of an I-would-have-done-that-anyway, let's-go-home type statement, is the following. Throughout the transcript of Mr. Huberfel's sentencing proceeding, Judge Hellerstein makes reference to possible guidelines interpretations and says at a number of points, no, that would be too punitive. That would be too punitive for the actions that took place. Now the 19 million, that would have been too punitive. And there were a couple of intermediary steps along that line. Now, in a vacuum, that might be somewhat troubling, Judge Lynch, because the guidelines aren't supposed to be an exercise that works that way. But one can reasonably interpret Judge Hellerstein's remarks along those lines as having a set place in mind for what the severity and seriousness of this crime actually warranted. And I think that to the extent that this Court assesses the total mix of information in determining whether Judge Hellerstein needed to do that. Breyer. When you're talking about there being a lot of data points, which there are, which there are, I don't think a reasonable person looking at this record, with all respect to your adversaries, would think that there's any chance that this judge would have given a 6- to 12-month sentence if there weren't a commercial bribery guideline in the book. He understood that this was a more serious crime. He took that into account. No question about that. But picking a number is always a somewhat mysterious exercise in sentencing. It's one thing to say, this is way worse than, as you put it, a $60,000 invoice fraud against a multimillion-dollar hedge fund. This is a different thing than that. That's easy to look at, to assess, to think is reasonable. But does that mean it's 24 months? Does that mean it's 30 months? Does that mean it's 36 months? Not a lot of difference between those in the grand scheme of things, but it makes a big difference to the defendant. And it's hard to say we know, even that Judge Hellerstein knows, what he would have done under a hypothetical different set of circumstances where a guideline that he paid a lot of attention to comes out a little differently, where he isn't also thinking that actually under the guidelines, the 24 to 30 or 30 to 37 is the right guideline rather than the wrong guideline. When you take all those factors into account, where do you come with the judgment that Mr. Eubefeld deserves more than the 6 to 12 months of the guidelines, 18, 24, 30? You change the mix of factors. It may change how it comes out. It may be, Judge, and obviously at bottom, sentencings are finally mysterious in a way that I think that, candidly, only one who has imposed them can fully appreciate. What I would note there, though, is this. The exercise that we're engaging in here, I think, is one of taking the commentary of somebody who did make that calculation in Judge Hellerstein, who said, I would have reached the same conclusion had this entirely been within the realm of the 35-53 factor consideration in a vacuum and come out this way. I think that because of Judge Hellerstein's familiarity with the record and because of his established commentary in talking about how much this crime bothered him for articulated reasons, but nevertheless being able to curb that impulse at points and say, well, that guideline would be too high, well, that guideline strikes me as being a bit too much. Goldilocks. He was doing Goldilocks. This is just right. And I think that to the extent that Judge Hellerstein tasted that porridge, his review would be owed a certain amount of deference, Your Honor. Thank you, counsel. Mr. Levitt, you have two minutes. Thank you, Your Honors. The additional issue with regard to the lost evidence, of course, is the 403 analysis. The district court's decision is entitled to due deference only if the court undertook a conscientious assessment of whether unfair prejudice substantially outweighs probative value. The Supreme Court in Old Chief explained that what counts as the 403 probative value of an item of evidence as distinct from its Rule 401 relevance may be calculated by comparing evidentiary alternatives, comparing evidentiary alternatives. Here, the district court did not at all discuss the evidentiary alternatives to admitting the lost evidence. And yet those alternatives were obvious, and they were powerful for the government as well, and included Platinum's offering plan, which laid out the risk very clearly, and which also include Attorney Wein's due diligence letter, both of which warned that Kober's entire investment could be lost. So that 403 balancing analysis was never utilized by the court. And I respectfully suggest that it was. Roberts. And the government's argument that you actually put into issue whether it was a good deal for the union was? Well, it was certainly argued to the jury that there were pluses and minuses to the investment. It was never argued. It was never argued that loss was not reasonably foreseeable, because anybody I think you could probably ask anybody in this courtroom whether or not they understand that a hedge fund could lose money. Every hand would go up. And you could go into a New York City subway and ask, do you understand that a hedge fund can lose money? Every hand would go up. And everybody in that subway car would say, boy, I know hedge funds. I've been solicited by hedge funds. I know all about those guys. I don't think so, Frank. But certainly the public does not. Go to a different place. Does not believe that that's a sure bet. Nobody believes that loss is not reasonably foreseeable. And one last point, if I can make it, please. With regard to the arguments the government made to the jury, the very arguments that the government agreed not to make to the jury, I just want to note that, Judge Pooler, you had previously said that one of the ways we can assess prejudice is to see how the prosecutor utilized the evidence in question, because the prosecutor knows his case the best. And in this case, the government used that evidence in precisely the way it acknowledged was improper, and it said it would not utilize, and it did so because it knew the importance of those improper arguments. Thank you. Counsel, also two minutes. Thank you, Your Honors. On procedural unreasonableness, I think it's important to bear in mind that the government is conceding not just that the commercial bribery guideline was miscalculated, but it is also conceding that that was an inapplicable guideline and that the use of the cross-reference in 2B1.1c3 was legally improper. So on the issue of procedural reasonableness, I think the sole question for this Court is whether it is clear in the words of Molina-Martinez that the judge would have imposed the same sentence. And we would respectfully submit that it is not, both because the judge sentenced at the bottom of the guidelines range and because at pages 102 to 105, 114, and 118 to 120 of the joint appendix, the judge noted the importance of the guidelines range in making his sentencing determination. On the issue of substantive unreasonableness, our submission is that while the judge can take into account other conduct, what the judge can't do is to sentence for the other uncharged offense. Sorry? How can you tell the difference? Well, because I think that here the judge repeatedly said that he was sentencing for bribery. And I think that his guidelines error infected the substantive reasonableness determination here. I know you all think that the 6 to 12 range applies, but I'm going to vary upwards or I'm going to look to this other guideline range. I mean, he was aware that the attorneys before him thought that the other guidelines were wrong. Judge Menasche, he did that because he thought that they were wrong and that he thought that the commercial bribery guideline was the applicable guideline. And part of the reason why I think this is difficult to untangle is precisely because of that. It was only at the end, at JA 151, that he swerved and he said, even if the other guideline applies, I would still impose the same sentence. Now, I think Mr. Bell, in an effort to defend this, focuses on the disparity in sentencing between Mr. Seabrook and Mr. Huberfeld. But I would submit that that's a bit rich because, of all people, it was Mr. Bell who, before the district court, very eloquently explained why such a disparity was warranted, starting at page 136 of the joint appendix. And I think that one thing, one last thing on substantive reasonableness, and that is that I think that one of the most troubling things about what Judge Hellerstein did is that he refused to conduct a hearing on the foreseeability of the loss in the face of unrebutted expert reports that the loss was not foreseeable, and then proceeded to make critical findings both on sentencing and on restitution about the foreseeability of the loss. Mr. Huberfeld was told that the fund was in the red zone because it was issuing $25 million a month in returns while only getting $5 million in, but this was not just rhetoric. This was really serious at this moment, and they needed to get new investors in. But that does not establish the foreseeability of the loss. And while I'm not disputing with you, Judge Lynch, that the judge can look to other evidence, I would note parenthetically, I may have misspoken in this regard, that of course it was Judge Carter who conducted the first trial where the jury hung, so it wasn't even Judge Hellerstein. But leaving that aside, we have a footnote in our reply brief that explains why that e-mail alone does not establish foreseeability of loss. That e-mail was the linchpin of the government's separate prosecutions of other platinum executives in the Eastern District of New York, and yet they were acquitted. And so, again, I would submit that they can get acquitted. They can all get acquitted. That's fine. That's a jury. The judge gets to decide by a preponderance of the evidence what the facts are, and that's a pretty potent fact to me. It's very hard for me to say that it is unreasonable for a judge to make a fact finding by a preponderance of the evidence on the face of that record that it was a foreseeable risk that this fund was going to go under. Well, again, Judge Lynch, we are operating in a somewhat contrafactual world because what we don't know is whether Judge Hellerstein would have made that same determination if he had thought that the applicable guidelines range was 6 to 12 months. And that brings me to the issue of reassignment, and I just want to say one quick thing on the issue of reassignment. Again, I realize that that is something that this Court does not do lightly, but here I would submit that all three of the reassignment factors point in favor of reassignment. Judge Hellerstein's unwavering focus on the bribery offense does suggest that he would be unlikely to act differently on remand. The government itself brought to the Court's attention Judge Hellerstein's significant contacts with Mr. Huberfeld's family and his religious community. I would point the Court to Docket Number 218. And finally, the proceedings on remand here are going to be relatively modest, and it would not be a great burden on another judge if this case were reassigned. Indeed, Judge Carter, who heard this case the first time around, would be in a similar position. And any other judge, I would submit, could conduct the reassignment quite – the resentencing quite expeditiously. Thank you. And so we would respectfully submit that the Court vacate and reassign on remand. Thank you. Thank you. We'll reserve decision. Good argument.